AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>A black hard shell American Tourister suitcase, more<br>fully described in Attachment A | )<br>)<br>)   Case No.   MJ19-554<br>)<br>)<br>) |

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
A black hard shell American Tourister suitcase, more fully described in Attachment A, incorporated herein by reference.

located in the _____Western_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841 and 846 | Possession of Controlled Substance with Intent to Distribute; Conspiracy to Distribute |
| 18 U.S.C. §§ 1956 and 924 | Money Laundering; Possession of a Firearm in Furtherance of Drug Trafficking |

The application is based on these facts:

✓   See Affidavit of Special Agent Ryan Smith, continued on the attached sheet.

☐   Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

Ryan Smith, DEA Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: __11/14/19__

_____
*Judge's signature*

City and state: __Bellingham, Washington__   Paula L. McCandlis, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT OF RYAN C. SMITH**

STATE OF WASHINGTON )

)    ss

COUNTY OF WHATCOM )

I, Ryan C. Smith, being first duly sworn on oath, depose and say:

## I.    INTRODUCTION AND AGENT BACKGROUND

1. I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7). Specifically, I am a Special Agent with the Drug Enforcement Administration ("DEA"), assigned to the Bellingham, Washington Resident Office. In that capacity, I investigate violations of the Controlled Substances Act (Title 21, United States Code, Section 801, *et seq*.). I have been employed as a Special Agent with the DEA since March 2017. Prior to becoming a Special Agent, I was a detective in the Special Victims Unit, a police motorcycle officer, and a police patrol officer with the Hoover Police Department in Hoover, Alabama. In my experience as a law enforcement officer, I have participated in numerous narcotics investigations, during the course of which I have participated in physical surveillance and executions of search warrants.

2. I have completed the DEA Basic Agent Training Course as well as other training courses related to gangs and narcotics trafficking. I have participated in narcotics investigations at both the local and federal level, and I have participated in the execution of federal search warrants. As a result, I have become familiar with methods of operation of drug traffickers and organizations. As a Special Agent with the DEA, I have the responsibility of working with other federal and state law enforcement officers in investigations of violations of federal and state controlled substance laws, including the investigation of violations related to cocaine, methylenedioxymethamphetamine (MDMA), methamphetamine, heroin, marijuana and other dangerous drugs.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

3.     I have participated in the debriefing of defendants, witnesses, and informants, during which time I have discussed with them their methods of drug smuggling, distribution, packaging, trafficking, avoiding law enforcement, and laundering proceeds, among other concerns related to drug trafficking.  I have discussed and learned from other law enforcement investigators in regards to these matters as well.

4.     Based on my training, experience, and conversations with other experienced narcotics investigators, I have gained insight into the techniques and methods used by drug traffickers to distribute controlled substances, their use of cellular phones and other electronic communication telephones to facilitate their trafficking activity, and the methods used to conceal and launder the proceeds of said activity.

5.     The facts in this affidavit come from my training, experience and information obtained from other agents and witnesses.

## II.    PURPOSE OF THIS AFFIDAVIT

6.     I make this affidavit in support of an application for a warrant authorizing the search of the following item, which is further described below and in Attachment A (attached hereto and incorporated by reference as if fully set forth herein), for evidence, fruits and instrumentalities, as further described in Attachments B (attached hereto and incorporated by reference as if fully set forth herein), of the crimes of *Distribution of, and Possession with Intent to Distribute, Controlled Substances*, in violation of 21 U.S.C. § 841(a)(1); and *Conspiracy to Distribute, and to Possess with the Intent to Distribute, Controlled Substances*, in violation of 21 U.S.C. §§ 841(a)(1), and 846, *Money Laundering*, in violation of 18 U.S.C. § 1956; and *Possession of a Firearm in Furtherance of Drug Trafficking*, in violation of 18 U.S.C. § 924(c), as described herein:

        a.  The **Target Item** is a black hard shell American Tourister suitcase. The **Target Item** was obtained on November 7, 2019, from A.E..  The

AFFIDAVIT OF SA SMITH - 2
USAO #2018R0949

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**Target Item** was assigned DEA exhibit number N-654 and is currently being stored as evidence at the DEA Bellingham Resident Office.

## III.   SOURCES OF INFORMATION

7.    I make this Affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources and others:

a.   My training and experience investigating drug trafficking and related criminal activity, as described above;

b.   Oral and written reports and documents about this and other investigations that I have received from agents of the DEA and the Whatcom County Sheriff's Office (WCSO), and other federal, state and local law enforcement agencies;

c.   Physical surveillance conducted by the aforementioned agencies, and other law enforcement agencies, that has been reported to me directly or indirectly;

d.   Telephone toll records and subscriber information;

e.   Washington State Department of Licensing records;

f.   Commercial Databases;

g.   Public records; and

h.   Publicly viewable information on social media websites (*i.e.*, Facebook); and

i.   Document, photographs and other records obtained via search warrant and subpoena.

8.    Since this Affidavit is intended to show only that there is a sufficient factual basis for a fair determination of probable cause to support the application, I have not included every fact known to me concerning this investigation.  I have set forth only the facts that I believe are essential to establish the necessary foundation for a search warrant for the **Target Item**.

9.    In the following paragraphs, I describe communications between various individuals. Except where specifically indicated with quotation marks, the descriptions are

AFFIDAVIT OF SA SMITH - 3
USAO #2018R0949

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  summaries of the conversations and are not meant to reflect the specific words or language
2  used.

3  ### IV.    SUMMARY OF INVESTIGATION

4      10.    An ongoing investigation is being conducted by the Drug Enforcement
5  Administration (DEA) into the importation of powdered fentanyl and its analogues by
6  Bradley WOOLARD, and others, both known and unknown.  Investigators believe that
7  WOOLARD (and, possibly, others) ordered the fentanyl over the internet from China.
8  Once WOOLARD and/or his coconspirators received the powdered fentanyl through the
9  mail, WOOLARD caused the fentanyl to be pressed into fentanyl-laced counterfeit
10  oxycodone pills, by Anthony PELAYO.  Once pressed into pills, WOOLARD, PELAYO,
11  Timothy MANTIE and others distributed these dangerous pills into the community.

12      11.    In July and August 2018, investigators executed multiple federal search
13  warrants at WOOLARD's residence, located at 9717 99th Avenue Northeast, Arlington,
14  Washington (hereinafter the "WOOLARD Residence").  Pursuant to those search
15  warrants, investigators seized approximately 10,000 light blue pills marked "M30" which
16  tested positive for furanyl fentanyl, a fentanyl analogue.  Investigators seized numerous
17  items during the searches of the WOOLARD Residence and outbuildings, including 33
18  firearms (the majority of which were concealed in a hidden room in a shop on the
19  property), thousands of rounds of ammunition, approximately $1.1 million in suspected
20  drug proceeds concealed in various locations throughout the WOOLARD Residence and
21  in the shop areas on the property, and cell phones, including an Apple iPhone.
22  Investigators seized multiple documents from the WOOLARD Residence referencing
23  telephone number (360) 395-5222 and email: bradwoolard79@gmail.com as being used
24  by WOOLARD.

25      12.    Investigators searched the iPhone and iPad seized from the WOOLARD
26  Residence pursuant to search warrants.  Investigators learned this iPhone was assigned
27  (360) 395-5222 and Apple ID bradwoolard@ymail.com.   Two email accounts were

28

AFFIDAVIT OF SA SMITH - 4
USAO #2018R0949

synced with this iPhone, bradwoolard@ymail.com and bradwoolard79@gmail.com. Review of emails on this phone revealed email exchanges between WOOLARD, using bradwoolard79@gmail.com, and individuals who appeared to be based in China. In these emails, WOOLARD and the China-based individuals openly discussed WOOLARD attempting to obtain various chemical substances, including fentanyl and furanyl fentanyl, from China.

13.    Investigators discovered that the iPad had a listed owner of "Brad's iPad" and an Apple ID of bradwoolard@ymail.com. In this iPad investigators located numerous messages between WOOLARD and PELAYO in which WOOLARD was providing PELAYO with a recipe on how to mix "active," which investigators believe to be fentanyl or a fentanyl analogue, to press into pills. Additionally, investigators identified a photograph sent to WOOLARD by PELAYO which appeared to depict a pill press.

14.    Investigators subsequently conducted a search warrant at PELAYO's residence and obtained an additional search warrant for cell phones seized from PELAYO's person. During the search of those phones, investigators identified approximately 135,000 messages between PELAYO and Andrew TONG. In those messages, they discussed the laundering of PELAYO's drug proceeds, which included the structured deposits of cash into PELAYO's accounts, as well as PELAYO's purchase of an RV, which was purchased in TONG's name.

15.    On June 12, 2019, a federal grand jury in the Western District of Washington returned a Superseding Indictment charging WOOLARD, Anthony PELAYO, Shawna BRUNS, Robert TABARES, Keith STRAND and Adrian BERGSTROM in *United States v. Woolard, et al.*, CR18-217RSM, with *Conspiracy to Distribute Controlled Substances*, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846 (Count 1), *Money Laundering Conspiracy*, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 1956(h) (Count 13), and additional counts charging substantive

Affidavit of SA Smith - 5
USAO #2018R0949

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1  drug trafficking and money laundering offenses. WOOLARD and PELAYO were also

2  charged with various firearms offenses.  PELAYO, BRUNS, TABARES and STRAND

3  were not charged in the Indictment previously returned by the Grand Jury.

4      16.    On June 12, 2019, BRUNS, TABARES, STRAND and BERGSTROM

5  were arrested, and the Superseding Indictment was unsealed.  An arrest warrant was

6  issued for PELAYO on June 12, 2019, however, PELAYO was not arrested until June 21,

7  2019.  Following detention hearings for TABARES, STRAND and BERGSTROM on

8  June 18, 2019, the Court released all three individuals on pretrial supervision.  PELAYO

9  is currently detained pending trial.  BRUNS has pleaded guilty and is detained pending

10  sentencing.

11      17.    On October 22, 2019, the grand jury returned a Second Superseding

12  Indictment in *United States v. Woolard, et al.*, CR18-217RSM, adding defendants

13  Timothy MANTIE, Jerome ISHAM, and Jose Feliciano LUGO, to *Conspiracy to*

14  *Distribute Controlled Substances*, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)

15  and 846 (Count 1).  The Second Superseding Indictment also added additional

16  substantive drug trafficking and firearms charges against WOOLARD, PELAYO,

17  ISHAM and LUGO.  Finally, the Second Superseding Indictment charged PELAYO and

18  TONG with *Conspiracy to Commit Money Laundering*, in violation of 18 U.S.C.

19  §§ 1956(a)(1)(B)(i), 1956(a)(1)(B)(ii) and 1957 (Count 35) and multiple substantive

20  counts of *Money Laundering*, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2. Also

21  on October 22, 2019, TONG was arrested at his residence in Oregon, and MANTIE was

22  arrested at his residence in Washington.  LUGO was arrested on October 24, 2019.

23  ISHAM was already in custody at the Federal Detention Center in SeaTac, Washington.  .

24

25

26

27

28

AFFIDAVIT OF SA SMITH - 6
USAO #2018R0949

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# V.   PROBABLE CAUSE

**A.   Background**

18.   On September 1, 2018, WOOLARD was arrested as he attempted to enter the United States using his U.S. Passport at the San Ysidro port of entry.[1]

19.   On September 13, 2018, a federal grand jury in the Western District of Washington returned an Indictment charging Bradley WOOLARD and Griffin THOMPSON in *United States v. Woolard, et al.*, CR18-217RSM, with *Conspiracy to Distribute Controlled Substances*, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846 (Count 1), and *Possession of Furanyl Fentanyl with Intent to Distribute*, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and 18 U.S.C. § 2 (Count 2). WOOLARD was also charged with *Possession of Furanyl Fentanyl with Intent to Distribute*, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and 18 U.S.C. § 2 (Count 3), *Felon in Possession of Firearms*, in violation of 18 U.S.C. § 922(g)(1) (Count 4), and *Possession of Firearms in Furtherance of a Drug Trafficking Offense*, in violation of 18 U.S.C. § 924(c).

20.   On September 13, 2018, THOMPSON was arrested pursuant to an arrest warrant.[2]

21.   In August 2018, pursuant to a federal search warrant, an iPad was seized from WOOLARD's residence.  Investigators subsequently obtained a federal search warrant for that device.  A search of that device revealed that the "Owner Name" was listed as "Brad's iPad" and the associated Apple ID was bradwoolard@ymail.com.  In this device, investigators identified messages between 425-299-6727, stored in WOOLARD's iPad as "Chono," and WOOLARD.  In June 2019, investigators placed a ruse call to this phone number and identified Jose LUGO as the user of 425-299-6727.

---

[1] WOOLARD has remained in custody since his arrest on September 1, 2018.
[2] Following a detention hearing on September 19, 2018, the Court released THOMPSON and placed him on pretrial supervision.

AFFIDAVIT OF SA SMITH - 7
USAO #2018R0949

1  These messages appeared discuss the sale of several firearms from LUGO to
2  WOOLARD.  According to NCIC, LUGO has a prior federal conviction for distribution
3  of oxycodone and multiple convictions for possession of a controlled substance in Utah.

4      22.    In March 2019, investigators conducted physical surveillance of PELAYO.
5  During that surveillance, investigators observed PELAYO riding in a vehicle registered
6  to LUGO.  Investigators observed, and photographed, that this vehicle had a sticker on
7  the back window.  The driver of that vehicle's physical description was consistent of that
8  of LUGO's.

9      23.    In May 2019, pursuant to a federal search warrant, investigators received
10  Apple iCloud data for PELAYO's iCloud account.  In this data, investigators identified
11  messages between PELAYO and Robert TABARES.  In these messages, PELAYO and
12  TABARES appeared to be discussing the purchase of a large mixer, which was shipped
13  to TABARES in a large wooden crate.  PELAYO and TABARES also exchanged
14  photographs of the wooden crate.  According to the messages, TABARES delivered the
15  wooden crate to another associate of PELAYO's.  Based on this investigation, I believe
16  that this mixer was to be used by PELAYO to mix fentanyl or fentanyl analogues with
17  binding agents prior to being pressed into pills.

18      24.    On May 29, 2019, US Magistrate Judge Paula L. McCandlis signed search
19  warrants authorizing the search of two of PELAYO's residences.  On May 30, 2019,
20  investigators executed these search warrants as described below.

21      25.    On May 30, 2019, investigators observed PELAYO depart his residence
22  and drive to Team Fitness in Lake Stevens, Washington.  Uniformed officers detained
23  PELAYO at Team Fitness, pending the execution of the search warrant at his residence.
24  During a pat down of PELAYO's person, investigators located a cell phone.
25  Investigators advised PELAYO of his *Miranda* rights, and PELAYO agreed to speak to
26  investigators.  PELAYO told investigators that there was a firearm in the center console
27  of his vehicle and signed consent for investigators to search his vehicle.  Investigators

28

AFFIDAVIT OF SA SMITH - 8
USAO #2018R0949

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

also found a rose gold Apple iPhone in PELAYO's vehicle.  Pursuant to a federal search warrant, investigators attempted to access both of these cell phones.  Investigators identified the phone located in PELAYO's pocket as 425-404-1227 and the phone seized from the door of PELAYO's vehicle as 425-239-8874.

26.     Investigators subsequently made entry to PELAYO's residence, located at 3423 68th Drive Northeast, Marysville, Washington pursuant to a search warrant.  During the search of the residence, investigators found in the kitchen of the residence a pill bottle with the label removed, which contained approximately 25 pills marked "M30."  These pills were consistent in appearance with the pills seized from WOOLARD's residence in July 2018.  Also found in the same drawer was approximately $19,461 in U.S. Currency and a box of Narcan nasal spray.  Narcan is a trade name for naloxone and naloxone is a drug used to block or reverse the effects of opioid drugs (fentanyl is an opioid).  Based on my training and experience I know that naloxone is frequently used to treat opioid overdose.  Located approximately 10 feet away, also in the kitchen, on top of the refrigerator was a Glock 19 handgun with a loaded magazine in the weapon but no round in the chamber.

27.     In a child's bedroom, investigators located a bag which contained approximately $100,000.  Across the hallway from the child's bedroom was the master bedroom.  A safe was located in the master bedroom and PELAYO unlocked the safe for investigators.  Located within the safe was a loaded revolver and another handgun.  This handgun had also had a loaded magazine in the weapon and no round in the chamber.

28.     Found in the garage of PELAYO's residence were two digital scales, a large industrial mixer (approximately 3 feet tall), and a gun safe which contained nine firearms.  Although the mixer appeared to be unused, PELAYO told investigators that the mixer was used to make sauces.

AFFIDAVIT OF SA SMITH - 9
USAO #2018R0949

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

29.     In total investigators seized approximately $129,201 in U.S. Currency, 13 firearms, 25 pills marked "M30," five vehicles and other evidence of drug trafficking from PELAYO's residence on 68th Drive Northeast.

30.     Also during the search, investigators located an April 2019 invoice for storage unit 7015 at the Clock Tower Self Storage, located at 9100 Highway 92, Lake Stevens, Washington 98258, in the name "Raymond JONES", at 3423 68th Drive Northeast, Marysville, Washington, PELAYO's address. Raymond JONES was the recipient of two parcels from China, which investigators believe contained furanyl fentanyl. The address those parcels were shipped to was 2405 Harrison Avenue, Everett, Washington 98201.

31.     On June 5, 2018, investigators obtained records from Clock Tower Self Storage pertaining to unit 7015. These records included a rental agreement in the name Raymond JONES. The rental agreement lists 3423 68th Drive Northeast, Marysville, Washington 98270 as the address for JONES and 425-404-1227 as JONES's phone number; as discussed above, these are the known address and phone number for PELAYO. This rental agreement was signed in November 2018. Investigators were provided a copy of a Florida driver's license, number J520-010-86-06-0, in the name Raymond JONES. According to NCIC, there are no records for Florida driver's license number J520-010-86-06-0. The individual depicted on the driver's license is PELAYO. Based on the information discussed above, investigators believe that unit 7015 is rented by PELAYO under the false name Raymond JONES. The records also indicate that on May 6, 2019, a cash payment of $511 for unit 7015 and on May 30, 2019, an additional $37.50 was paid. The records indicate that the storage unit is paid through December 2019.

32.     The records indicated that on May 30, 2019, the day of the search warrants at PELAYO's residence, PELAYO accessed a building at the Clock Tower Self Storage at approximately 5:55 p.m., and again at approximately 9:56 p.m. During the visit at

AFFIDAVIT OF SA SMITH - 10
USAO #2018R0949

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  approximately 6:00 p.m., PELAYO drove into the building in a silver sedan, which
2  investigators identified as a rental car.  According to rental records this vehicle was
3  rented by Richard Estep.  At approximately 10:07 p.m., the records indicate that
4  PELAYO used the exit keypad and at 10:08 p.m., and an associate, Jose LUGO's, red
5  Silverado was observed driving out of the gate.

6         33.    Investigators viewed surveillance video of the Clock Tower Self Storage
7  and on May 30, 2019, around 10:00 p.m., a red pickup truck pulled into the Clock Tower
8  Self Storage.  The license plate of the truck is not visible but a sticker on the rear window
9  just below the rear taillight is visible; this sticker is consistent with the sticker visible on
10 the rear window of LUGO's red Silverado observed by investigators during surveillance,
11 discussed above.  Based on the physical appearance of the truck, this sticker and LUGO's
12 association with PELAYO, investigators believe this truck to be LUGO's red Silverado.
13 The surveillance video depicted an individual loading a heavy crate into the bed of
14 LUGO's red Silverado.  Investigators obtained a screen capture of that video.  The crate
15 appears to be the same crate that is depicted in the messages between PELAYO and
16 TABARES, discussed above.  This crate contained the mixer purchased by TABARES
17 on behalf of PELAYO.  Based on my training and experience, I know that such a mixer
18 could be used while pressing fentanyl or fentanyl analogues into counterfeit pills.

19        34.    On June 6, 2019, investigators obtained a search warrant for PELAYO's
20 storage locker.  Investigators executed the search warrant the same day.  No items were
21 seized from the storage locker, however, investigators did see supplies for a marijuana
22 grow, to include grow lights, box and pots.

23        35.    On June 12, 2019, a federal grand jury in the Western District of
24 Washington returned a Superseding Indictment charging WOOLARD, Anthony
25 PELAYO, Shawna BRUNS, Robert TABARES, Keith STRAND and Adrian
26 BERGSTROM in *United States v. Woolard, et al.*, CR18-217RSM, with *Conspiracy to
27 Distribute Controlled Substances*, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)

28

AFFIDAVIT OF SA SMITH - 11
USAO #2018R0949

1  and 846 (Count 1), *Money Laundering Conspiracy*, in violation of 18 U.S.C. §§ 1956 and

2  1957 (Count 13), and additional substantive counts. WOOLARD was also charged with

3  *Felon in Possession of Firearms*, and *Unlawful User of Controlled Substances in*

4  *Possession of Firearms*, in violation of 18 U.S.C. § 922(g)(1), and *Possession of*

5  *Firearms in Furtherance of a Drug Trafficking Offense*, in violation of 18 U.S.C.

6  § 924(c).  PELAYO was also charged with two counts of *Possession of Firearms in*

7  *Furtherance of a Drug Trafficking Offense*, in violation of 18 U.S.C. § 924(c).

8       36.     BRUNS, TABARES, STRAND and BERGSTROM[3] were arrested on

9  June 12, 2019.  Investigators attempted to locate PELAYO but were unable to find him.

10  On June 13, 2019, PELAYO's then-attorney indicated that PELAYO was going to turn

11  himself in, pursuant to the arrest warrant.  Notwithstanding counsel's representation,

12  PELAYO did not turn himself in.  Instead, investigators obtained tracking warrants for

13  PELAYO's phones, and using that location information, arrested PELAYO on June 21,

14  2019, as discussed below.

15  **B.     GPS Tracking and Arrest of PELAYO**

16       37.     On June 20, 2019, Chief U.S. Magistrate Judge Brian A. Tsuchida signed a

17  tracking warrant for two phones believed to be used by PELAYO.  On the same day, the

18  tracking warrant was served on AT&T and investigators began receiving location data.

19       38.     On June 21, 2019, investigators, utilizing the location data, established

20  surveillance at 12618 44th Avenue Northeast, Marysville, Washington; a residence at

21  which investigators believed PELAYO could be staying.  Investigators later saw

22  PELAYO leave the residence and drive to a nearby Winco grocery store.

23       39.     While at the Winco, investigators lost sight of PELAYO.  A short time later

24  the location data for one of the phones indicated of the phone was approximately five

25  miles south of the Winco.  Investigators drove south on I-5 toward Seattle in an attempt

26

27  ───────────────

28  [3] Following detention hearings for TABARES, STRAND and BERGSTROM on June 18, 2019, the Court released all three individuals on pretrial supervision.

AFFIDAVIT OF SA SMITH - 12
USAO #2018R0949

1  to locate PELAYO and subsequently located a black Acura sedan, bearing Oregon

2  license plate CK49822, which investigators had previously seen at PELAYO's residence.

3         40.    In Seattle, the black Acura sedan was stopped by uniformed officers.

4  Investigators identified the passenger in the vehicle as PELAYO and arrested him

5  pursuant to the previously issued arrest warrant.

6  **C.    Pelayo's money laundering activity**

7         41.    As noted above, investigators obtained search warrants to search the cell

8  phones seized from PELAYO and subsequently searched those devices.  Investigators

9  identified approximately 135,000 messages between PELAYO and 503-806-2434.  This

10  phone number was saved in PELAYO's phone as "Andrew Portland."  According to

11  AT&T records, the financial liable party for 503-806-2434 is Naren Soutavong at 13268

12  Southwest Shore Drive, Tigard, Oregon and the user information is listed as Andrew

13  TONG at 13268 Southwest Shore Drive, Tigard, Oregon.

14         42.    In text messages between PELAYO and TONG, the two discuss

15  PELAYO's lucrative drug trafficking.  PELAYO and TONG also discuss their laundering

16  of PELAYO's drug proceeds by purchasing the RV (discussed above) and putting it in

17  TONG's name; by TONG structuring cash deposits into PELAYO's bank accounts;

18  TONG's purchase of a $100,000 cashier's check, which was deposited into PELAYO's

19  bank account; and numerous wire transfers of funds by TONG into PELAYO's bank

20  accounts.  Based upon review of text messages exchanged between PELAYO and

21  TONG, and the financial records obtained thus far, it appears that TONG knowingly

22  laundered over $300,000 of PELAYO's cash drug proceeds.  Additionally, it further

23  appears that while PELAYO was a fugitive, PELAYO transferred $200,000 to TONG.

24  Investigators believe that these transfers by PELAYO to TONG represent additional

25  attempts by PELAYO to conceal his drug proceeds from law enforcement and avoid

26  seizure thereof.   I discuss some, but not all, of the messages between PELAYO and

27  TONG and pertinent financial records below.

28

AFFIDAVIT OF SA SMITH - 13
USAO #2018R0949

1    43.    On May 12, 2017, TONG wrote, "You need to pay someone to launder

2    your money to put it on paper for u," "Idk where," "You need to spread it out too to make

3    it legit."  PELAYO texted, "I got like 14k on pap" and TONG replied, "yeah you gonna

4    need way more," "Before u file ur taxes," and "that way you can use it."  Similarly, in

5    messages on March 5, 2018, TONG and PELAYO discussed going to college, then

6    PELAYO wrote to TONG, "I just wanna learn how to launder money" to which TONG,

7    "shit u need someone to poen shit for u under their name" and "thought u was gonna

8    open up those coffee shops."  PELAYO later wrote, "It's hard for me to commit to

9    something cuz I look at the money start a business and make 100-200 a year I can make

10   more than that in a month."  Based on these text messages, and the other evidence

11   discussed herein, it appears that PELAYO and TONG are very well aware of the need for

12   PELAYO to launder his drug proceeds, and the purpose of their bulk cash transfers,

13   vehicle purchases and wire transfers.

14   44.    According to the Washington State Department of Revenue's public

15   website, Anthony PELAYO opened a sole proprietorship in the name of Tony's

16   Automotive Upholster (UBI 604 104 314) on March 20, 2017.  (A screenshot located

17   during the execution of search warrants show the actual online filing date was March 14,

18   2017.)  PELAYO and TONG discussed the formation of this business in the days before

19   PELAYO did the online filing date for it.  PELAYO texted, "I'm about to file for m

20   business license."  TONG replied, "Online?"  PELAYO responded, "Yeah."  TONG

21   responded, "They gonna knock on ur door" and "Lol."  PELAYO responded, "Na hell no

22   I've been doin it for 7 years but imma start claiming more money so I wanna get a

23   business account" and added, "So I can get a business loan."

24   45.    Beginning in 2017, and continuing into early 2018, PELAYO and TONG

25   discuss having TONG purchase an RV, using cash provided by PELAYO, in an attempt

26   to conceal that the true owner of the RV was PELAYO.  I discuss some, but not all, of the

27   texts herein.

28

AFFIDAVIT OF SA SMITH - 14
USAO #2018R0949

46.     For example, on February 8, 2018, PELAYO and TONG discuss PELAYO purchasing the RV in Oregon to avoid sales taxes and PELAYO said, "ya I'll put under Noi's name" and "or someone down there."  TONG responded, "Or put it in mine.  I just don't know how to drive it."

47.     The messages confirm on March 18, 2018, TONG purchased an RV on PELAYO's behalf with cash brought to Oregon by PELAYO.  Specifically, on March 18, 2018, TONG said, "U bout to buy a rv" and PELAYO responded, "no u r."  Also, TONG said, "chump change after I saw u drop 103k on those fools."  Additionally, PELAYO said, "do they know I paid in cash."  This RV was seized from PEYALO's residence located on Russian Road in Arlington, during the search warrant discussed above and is indeed registered to Andrew TONG, at 13268 Southwest Shore Drive, Tigard, Oregon.

48.     Investigators have interviewed employees at Camping World RV in Wood Village Oregon regarding the purchase of this RV.  The employees recalled the transaction because of its unusually large amount of US currency.  An employee involved in the transaction was shown photographs of PELAYO and TONG and stated that both were similar in appearance to the individuals who bought the RV.  The employees stated that the purchaser, TONG, stated that he was an "Instagrammer" and that he got the money for the RV from his "Instagram" activity.

49.     On July 16, 2018, PELAYO asked TONG, "U still wanna do that 100k shit?" and TONG responded, "Whenever u want me to call them and send you a cashier check."  PELAYO responded, "Lol ok imam send the loot with Noi II'm sure u will c here at grandpas."  Later TONG said, "What should I tell them to put in the memo?" and "Pelayo investments?"  PELAYO replied, "Make it out to pelayo & sons llc."  And TONG replied, "But with your name?" "or just that."  PELAYO responded, "you can put my name on it to."  The following day PELAYO sent, "hey so you want all 100's right."

50.     On the same day, TONG asked "U got more to clean?" and PELAYO responded "Ya but we can do it later."

United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

51.     On July 19, 2018, TONG and PELAYO text about the cashier's check. TONG wrote, "I've never seen a check that big before" and "Nor have I seen soooo many twenties lol."  PELAYO replied, "U give me a .5 ounce check I give u 30lbs in 20's lol." I believe these texts reflect that PELAYO provided the cash (30 pounds of $20 bills) to TONG to purchase a $100,000 cashier's check.

52.     Consistent with the above text exchange, the following is a copy of a $100,000 cashier's check deposited into PELAYO's Chase bank account on July 19, 2018.  The check indicates that the remitter (i.e., the individual who purchased the cashier's check) was Andrew TONG:



53.     On October 17, 2018, TONG sent the following photo to PELAYO and said, "how do u want this," "I told u I got hella bills," and "want me to slowly put it into your account?"  Counting the money bands in the image below, there appears to be $90,000 in US currency.



54.     PELAYO responded, "faster the better really" and TONG said, "well yeah but I don't wanna slam 10k a day," "that's irs," "I was thinking 8k a day" and "into you business account."  PELAYO then sent a photograph which contained his bank account number and routing number and "Pelayo & sons llc."  In these texts, I believe that PELAYO told TONG to make the deposits as quickly as possible.  TONG cautioned, however, that he did not want to deposit a large quantity in one day due to the "IRS."  I believe that TONG wanted to avoid the filing of a currency transaction report (CTR), which banks are required to file for cash transactions (deposits or withdrawals) of more than $10,000 in cash.

55.     The above texts messages are consistent with structured cash deposits made into PELAYO's bank accounts.  According to the bank records, $110,480 of the total deposits consisted of cash.  The timing of the above discussion and the following deposits are consistent.

Affidavit of SA Smith - 17
USAO #2018R0949

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

| Clear Date | Statement Description | Bank Item Description | Deposit |
|---|---|---|---|
| 10/23/2018 | Deposit | Cash In | $8,000.00 |
| 10/25/2018 | Deposit | Cash In | $8,000.00 |
| 10/26/2018 | Deposit | Cash In | $8,000.00 |
| 10/29/2018 | Deposit | Cash In | $8,000.00 |
| 10/31/2018 | Deposit | Cash In | $8,000.00 |
| | | | **$40,000.00** |

56.    In addition, the bank records show that TONG wired an additional $134,880.00 into PELAYO's checking accounts:

| Clear Date | Statement Description | Deposit |
|---|---|---|
| 11/29/2018 | Fedwire Credit; The Bank of New York Mellon; Andrew Tong | $20,000.00 |
| 12/17/2018 | Fedwire Credit; The Bank of New York Mellon; Andrew Tong | $20,000.00 |
| 1/10/2019 | Fedwire Credit; The Bank of New York Mellon; Andrew Tong | $20,000.00 |
| 1/24/2019 | Fedwire Credit; The Bank of New York Mellon; Andrew Tong | $14,880.00 |
| 2/14/2019 | Fedwire Credit; The Bank of New York Mellon; Andrew Tong | $20,000.00 |
| 5/13/2019 | Fedwire Credit; The Bank of New York Mellon; Andrew Tong | $40,000.00 |
| | Total | $134,880.00 |

57.    As discussed above, on May 30, 2019, law enforcement contacted PELAYO and searched his properties on 68th and on Russian Road.  On June 12, 2019, the Superseding Indictment was unsealed.  Investigators attempted to locate PELAYO at his residence that day but were unsuccessful.  On June 17, 2019, investigators interviewed PELAYO's wife and mother in an attempt to locate PELAYO.  Based on statements made by both PELAYO's wife and mother, investigators believe that

AFFIDAVIT OF SA SMITH - 18
USAO #2018R0949

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   PELAYO already knew that there was a warrant for his arrest and that investigators were

2   looking for him.  As noted above, it was not until June 21, 2019, that PELAYO was

3   arrested.

4        58.   PELAYO's bank records show that on both June 17, 2019, and on June 18,

5   2019, PELAYO sent $100,000 wires to TONG, with the memo, "return investment

6   property money."  Based on these bank records and statements, investigators believe that

7   PELAYO was attempting to hide his assets prior to his arrest, and, further, that PELAYO

8   entrusted $200,000 of his drug proceeds with TONG.

9   **C.    Interview of A.E.**

10       59.   October 30, 2019, investigators interviewed A.E. as part of the ongoing

11  investigation described herein, at Wells Fargo in downtown Everett, Washington.  During

12  the interview, A.E. said that she lived in a cul-de-sac on 44th.  A check with the

13  Washington Department of Licensing shows A.E.'s listed address is 12618 44th Avenue

14  NE, Marysville, Washington[4]; the same address from which investigators saw PELAYO

15  leaving the day of PELAYO's arrest.

16       60.   A.E. told investigators PELAYO was her cousin and identified text

17  messages, obtained via search warrant, as being between her and PELAYO.  A.E. told

18  investigators that around the time of PELAYO's arrest PELAYO had requested to stay at

19  A.E.'s residence for a night or two.  A.E. went on to say that PELAYO did stay at her

20  residence, but that she only saw PELAYO in the mornings or evenings, as A.E. worked at

21  Wells Fargo during the day.

22       61.   A.E. informed investigators that there was a small suitcase (**Target Item**)

23  left in their downstairs bedroom, where PELAYO had been staying.  A.E. stated that the

24  **Target Item** did not belong to her or her husband. A.E. believed the **Target Item**

25

26

27  _____

28  [4] A.E.'s listed address is on a cul-de-sac.
    AFFIDAVIT OF SA SMITH - 19
    USAO #2018R0949

1  belonged to PELAYO or his wife.  A.E. told investigators that she had not looked inside
2  of **Target Item** to see if anything was inside.

3      62.     On November 6, 2019, investigators spoke with A.E. via telephone, and
4  asked A.E. if investigators could retrieve the suitcase (**Target Item**) thought to be left by
5  PELAYO or his wife.  A.E. told investigators that the **Target Item** could be picked up at
6  her house or at her office.  Investigators made arrangement to retrieve the **Target Item**
7  from A.E. at her office the following day.  A.E. also told investigators that she recently
8  found her children playing with and in the **Target Item**, and that the **Target Item** was
9  empty.

10     63.     On November 7, 2019, investigators met A.E. at her place of work, Wells
11  Fargo at 2801 Wetmore Avenue, Everett Washington, and took possession of the **Target
12  Item**. The **Target Item** was then transported to the DEA Bellingham Resident Office
13  where it was secured as evidence.

14     64.     Even though A.E. indicated the **Target Item** was empty, investigators
15  know, through training and experience, that often times drug traffickers hide items, which
16  may be of evidentiary value to law enforcement, in places that are sometimes not easily
17  identifiable.  Examples of such places where items could be concealed are walls, traps in
18  vehicles, or other hidden compartments such as those that are sometimes found in
19  luggage, purses, or clothes.  Investigators seek to search the **Target Item** to determine the
20  contents of the **Target Item** and to search the **Target Item** for possible hidden
21  compartments that could contain easily concealable items.

22

23          **VI.     KNOWLEDGE BASED ON TRAINING AND EXPERIENCE**

24     65.     Based on my training and experience, and my discussions with other
25  experienced officers and agents involved in drug and money laundering investigations, I
26  know the following:

27

28

AFFIDAVIT OF SA SMITH - 20
USAO #2018R0949

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a.      Money launderers often have banking records to include but not limited to, deposit or withdrawal slips, bank statements, checks, or money orders.  Some of these banking records may not be in their own name. Money launderers often have several accounts documented in some form, or instructions detailing how to handle each respective account.  For example, they may have a list of accounts belonging to several different people with instructions for how much to deposit or withdraw from each and often maintain this information for long periods of time in their residences or safe deposit boxes.

b.      Money launderers often have records or evidence related to how the proceeds were spent or concealed and often maintain this information for long periods of time in their residences or safe deposit boxes.  Evidence may include jewelry and/or vehicles, as well as the contents of storage lockers, safe deposit boxes or bank accounts. The use of bank accounts is a common money movement technique used by drug traffickers to receive payment for narcotics from customers outside of their geographic region.  It is common for a trafficker to use several bank accounts for this purpose simultaneously in an attempt to avoid detection by the financial institutions and/or law enforcement.

c.      The use of multiple accounts, and the commingling of illicit funds with legitimate funds in particular, is often part of the plan to conceal the illegal activity or may be part of the overall integration mechanism by which the illicit funds are made to appear as part of the legitimate income so that only a small portion of or even none of the funds from an account are seized.

d.      Traffickers of controlled substances and money launderers, and those who assist them,  maintain and tend to retain accounts or records of their drug trafficking and money laundering activities, including lists of drug quantities and money owed, telephone records including contact names and numbers, photographs, and similar records of evidentiary value.  These items are generally kept in locations where drug

AFFIDAVIT OF SA SMITH - 21
USAO #2018R0949

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   traffickers believe their property is secure and will remain undetected from law

2   enforcement, such as inside their homes, vehicles and storage lockers.

3           f.      Traffickers of controlled substances commonly maintain addresses,

4   vehicles, or telephone numbers which reflect names, addresses, vehicles, and/or

5   telephone numbers of their suppliers, customers and associates in the trafficking

6   organization and it is common to find drug traffickers keeping records of said associates

7   in cellular telephones and other electronic devices.  Traffickers almost always maintain

8   cellular telephones for ready access to their clientele and to maintain their ongoing

9   narcotics business.

10          g.      Traffickers and money launderers maintain evidence of their

11  criminal activity at locations that are convenient to them, including their residences

12  vehicles, and storage lockers.  This evidence often includes more than contraband and

13  paraphernalia and includes financial records, records of property and vehicle ownership,

14  records of property rented, records of post office boxes used to ship and receive

15  contraband and currency, records of other storage facilities used to hide drugs or

16  currency, and other documentary evidence relating to commission of, and proceeds from,

17  their crimes.

18          h.      During the execution of search warrants, it is common to find

19  papers, letters, billings, documents, and other writings which show ownership, dominion,

20  and control of vehicles, residences, and/or storage units.

21          i.      Persons trafficking and using controlled substances commonly sell

22  or use more than one type of controlled substance at any one time.

23          j.      Traffickers frequently maintain items necessary for weighing,

24  packaging, and cutting drugs for distribution.  This paraphernalia often includes, but is

25  not limited to, scales, plastic bags, pill presses and cutting/diluting agents and items to

26  mask the odor of drugs

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

k.      Traffickers and money launderers often maintain weapons, including guns and ammunition, in secure locations such as their residences and storage lockers, in order to protect their drugs and drug proceeds.

l.      Traffickers often have false identification documents and identification documents in the names of others in order to conceal their identities.

m.      Traffickers very often place assets in names other than their own, or use fictitious names and identification, to avoid detection and seizure of these assets by law enforcement.  Even though these assets are in other persons' names, the traffickers actually own and continue to use these assets and exercise dominion and control over them.

n.      Drug trafficking is a cash business, and in order to escape notice from authorities for using unexplained income, or hide excessive cash from illegal activities, traffickers either keep large quantities of cash at home or other secure locations such as a vehicles and storage locker, or convert the cash into other valuable assets, such as jewelry, precious metals, monetary instruments, or other negotiable forms of wealth. Records of such conversions are often stored where a trafficker lives.

o.      Illegal drug trafficking is a continuing activity over months and even years.  Illegal drug traffickers will repeatedly obtain and distribute controlled substances on a somewhat regular basis, much as any distributor of a legitimate commodity would purchase stock for sale, and, similarly, drug traffickers will have an "inventory," which fluctuates in size depending upon various factors, including the demand and supply for the product.  I would expect the trafficker to keep records of his illegal activities for a period of time extending beyond the time during which he actually possesses illegal controlled substances, in order that he can maintain contact with his criminal associates for future drug transactions, and so that he can have records of prior transactions for which, for example, he might still be owed money, or might owe someone else money. These records are often created in code.

AFFIDAVIT OF SA SMITH - 23
USAO #2018R0949

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

66.     Drug dealers and money launderers use cellular telephones as a tool or instrumentality in committing their criminal activity. They use them to maintain contact with their suppliers, distributors, and customers. They prefer cellular telephones because, first, they can be purchased without the location and personal information that land lines require. Second, they can be easily carried to permit the user maximum flexibility in meeting associates, avoiding police surveillance, and traveling to obtain or distribute drugs. Third, they can be passed between members of a drug conspiracy to allow substitution when one member leaves the area temporarily. I also know that it is common for drug traffickers to retain in their possession phones that they previously used, but have discontinued actively using, for their drug trafficking business. Based on my training and experience, the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or crimes. This includes the following:

a.     The assigned number to the cellular telephone (known as the mobile directory number or MDN), and the identifying telephone serial number (Electronic Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are important evidence because they reveal the service provider, allow us to obtain subscriber information, and uniquely identify the telephone. This information can be used to obtain toll records, to identify contacts by this telephone with other cellular telephones used by co-conspirators, to identify other telephones used by the same subscriber or purchased as part of a package, and to confirm if the telephone was contacted by a cooperating source or was intercepted on a wiretap here or in another district.

b.     The stored list of recent received calls and sent calls is important evidence.  It identifies telephones recently in contact with the telephone user. This is valuable information in a drug investigation because it will identify telephones used by other members of the organization, such as suppliers, distributors, and customers, and it confirms the date and time of contacts. If the user is under surveillance, it identifies what

1   number he called during or around the time of a drug transaction or surveilled meeting.

2   Even if a contact involves a telephone user not part of the conspiracy, the information is

3   helpful (and thus is evidence) because it leads to friends and associates of the user who

4   can identify the user, help locate the user, and provide information about the user.

5   Identifying a defendant's law-abiding friends is often just as useful as identifying his

6   drug-trafficking associates.

7          c.      Stored text messages are important evidence, similar to stored

8   numbers.  Agents can identify both drug associates, and friends of the user who likely

9   have helpful information about the user, his location, and his activities.

10          d.      Photographs and videos on a cellular telephone are evidence because

11   they help identify the user, either through his or her own picture, or through pictures of

12   friends, family, and associates that can identify the user. Pictures also identify associates

13   likely to be members of the drug trafficking organization. Some drug dealers photograph

14   groups of associates, sometimes posing with weapons and showing identifiable gang

15   signs. Also, digital photos often have embedded "geocode" information within them.

16   Geocode information is typically the longitude and latitude where the photo was taken.

17   Showing where the photo was taken can have evidentiary value.  This location

18   information is helpful because, for example, it can show where coconspirators meet,

19   where they travel, and where assets might be located.

20          e.      Stored address records are important evidence because they show the

21   user's close associates and family members, and they contain names and nicknames

22   connected to phone numbers that can be used to identify suspects.

23          f.      It is common for drug traffickers and money launderers to use

24   encrypted means of communication, such as WhatsApp, Signal, Wickr, and Telegram, to

25   attempt to avoid detection by law enforcement.  It is common for drug traffickers to

26   install and use these apps on their phones in order to make encrypted calls and send

27   encrypted messages.

28

AFFIDAVIT OF SA SMITH - 25
USAO #2018R0949

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Investigators are seeking authorization under this warrant to seize and search all cell

2  phones found in the **Target Item.**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# IV.   CONCLUSION

67.   Based on the information set forth herein, there is probable cause to search the above described **Target Item** as further described in Attachment A, for evidence, fruits and instrumentalities, as further described in Attachment B, of crimes committed by the individuals listed in this affidavit and their coconspirators, specifically *Distribution of, and Possession with Intent to Distribute, Controlled Substances*, in violation of 21 U.S.C. § 841(a)(1); and *Conspiracy to Distribute, and to Possess with the Intent to Distribute, Controlled Substances*, in violation of 21 U.S.C. §§ 841(a)(1), and 846, *Money Laundering*, in violation of 18 U.S.C. 1956; and *Possession of a Firearm in Furtherance of Drug Trafficking*, in violation of 18 U.S.C. § 924(c).

68.   Because the **Target Item** is already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

Ryan C. Smith
Special Agent
Drug Enforcement Administration

The above-named agent provided a sworn statement attesting to the truth of the contents of the foregoing affidavit on the 14th day of November, 2019.

Hon. Paula L. McCandlis
United States Magistrate Judge

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A**

**(Target Item to Be Searched)**

The Target Item is a black hard shell American Tourister suitcase. The Target Item was obtained on November 7, 2019, from A.E..  The Target Item was assigned DEA exhibit number N-654 and is currently being stored as evidence at the DEA Bellingham Resident Office.

## ATTACHMENT B

## Items to Be Seized

The items to be searched for, seized, and examined, are those items in the **Target Item**, referenced in Attachment A, that contain or are evidence, contraband, fruits, and instrumentalities of violations of *Distribution of, and Possession with Intent to Distribute, Controlled Substances*, in violation of 21 U.S.C. § 841(a)(1); and *Conspiracy to Distribute, and to Possess with the Intent to Distribute, Controlled* Substances, in violation of 21 U.S.C. §§ 841(a)(1), and 846, *Money Laundering*, in violation of 18 U.S.C. § 1956; and *Possession of a Firearm in Furtherance of Drug Trafficking*, in violation of 18 U.S.C. § 924(c).  The items to be seized cover the period of February 1, 2016 through the date of the execution of the search warrant.

1.      The items referenced to be searched for, seized, and examined are as follows:

a.      Controlled substances, including but not limited to fentanyl and its analogues (powder and/or pressed into pills) held in violation of 21 U.S.C. Sections 841(a)(1) and 846;

b.      Drug Paraphernalia:  Items used, or to be used, to store, process, package, use, and/or distribute controlled substances, such as plastic bags, cutting agents, scales, measuring equipment, tape, hockey or duffel bags, chemicals or items used to test the purity and/or quality of controlled substances, and similar items.

**Page 1 – Attachment B**

      c.      Documents such as ledgers, receipts, notes, and similar items relating to the acquisition, transportation, and distribution of controlled substances; books, records, receipts, notes, ledgers, and other documents relating to money laundering, the manufacture and distribution of controlled substances, communications between members of the conspiracy, and evidence of the use of apparently legitimate businesses to disguise profits.

      d.      Customer and Supplier Information:  Items identifying drug customers and drug suppliers, such as telephone records, personal address books, correspondence, diaries, calendars, notes with phone numbers and names, "pay/owe sheets" with drug amounts and prices, maps or directions, and similar items.

      e.      Cash and Financial Records:  Currency and financial records, including bank records, safe deposit box records and keys, credit card records, bills, receipts, tax returns, vehicle documents, and similar items; and other records that show income and expenditures, net worth, money transfers, wire transmittals, negotiable instruments, bank drafts, cashier's checks, and similar items, and money counters.

      f.      Codes:  Evidence of codes used in the distribution of controlled substances, including but not limited to passwords, code books, cypher or decryption keys, and similar information.

      g.      Property Records:  Deeds, contracts, escrow documents, mortgage documents, rental documents, and other evidence relating to the purchase, ownership,

**Page 2 – Attachment B**

rental, income, expenses, or control of the premises, and similar records of other property owned or rented.

h.      Evidence of Storage Unit Rental or Access:  rental and payment records, keys and codes, pamphlets, contracts, contact information, directions, passwords or other documents relating to storage units.

i.      Evidence of Personal Property Ownership:  Registration information, ownership documents, or other evidence of ownership of property including, but not limited to vehicles, vessels, boats, airplanes, jet skis, all terrain vehicles, RVs, and personal property; evidence of international or domestic travel, hotel/motel stays, and any other evidence of unexplained wealth,

j.      All bearer bonds, letters of credit, money drafts, money orders, cashier's checks, travelers checks, Treasury checks, bank checks, passbooks, bank drafts, money wrappers, stored value cards, and other forms of financial remuneration evidencing the obtaining, secreting, transfer, and/or concealment of assets and/or expenditures of money.

k.      All Western Union and/or Money Gram documents and other documents evidencing domestic or international wire transfers, money orders, official checks, cashier's checks, or other negotiable interests that can be purchased with cash, These documents are to include applications, payment records, money orders, frequent customer cards, etc.

**Page 3 – Attachment B**

l. Negotiable instruments, jewelry, precious metals, financial instruments, and other negotiable instruments.

m. Documents reflecting the source, receipt, transfer, control, ownership, and disposition of United States and/or foreign currency, bitcoin or other digital currency.

n. Firearms and other dangerous weapons and ammunition;

o. Financial profits, proceeds and instrumentalities of money laundering, and financial profits and proceeds of trafficking in narcotics, including U.S. Currency and other items of value;

p. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to money laundering or the manufacture, importation and distribution of controlled substances;

q. Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries; airline schedules; bills; charge card receipts; hotel, motel, and car rental statements; correspondence with travel agencies and other travel related businesses; airline, rent a car, and hotel frequent flier or user cards and statements; passports and visas; telephone bills; photographs of foreign locations; and papers relating to domestic and international travel;

r. Cellular telephones and computers and other electronic devices capable of storing data that constitutes evidence or the instrumentality of money

**Page 4 – Attachment B**

laundering and narcotics trafficking.

        s.     Latent prints and identifying material from items in the Target Item.

    2.    Cell Phones: Cellular telephones and other communications devices including smartphones (i.e., iPhones, Android phones, iPads, and the like) may be seized, and searched for the following items pursuant to this Warrant:

        a.     Assigned number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);

        b.     Stored list of recent received, sent, and missed calls;

        c.     Stored contact information;

        d.     Stored photographs and videos of narcotics, currency, financial records relating to money laundering or the manufacture, importation and distribution of controlled substances, assets such as RVs and other vehicles, firearms or other weapons, evidence of suspected criminal activity, and/or the user of the phone or suspected co-conspirators, including any embedded GPS data associated with those photographs/videos;

        e.     Stored text messages that relate to money laundering or the manufacture, importation and distribution of controlled substances or that may show the user of the phone and/or coconspirators, including Apple iMessages, Blackberry Messenger messages, or other similar messaging services, including encrypted messaging apps such as WhatsApp, Wickr, and Telegram, where the data is stored on the telephone.

**Page 5 – Attachment B**

3.      As used in this attachment, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.  The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.  The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, DVDs, flash drives, USBs, thumb drives, and other magnetic or optical media.

**AGENTS ARE AUTHORIZED TO SEIZE AND SEARCH MOBILE PHONES AND TABLETS UNDER THE PARAMETERS SET FORTH ABOVE.  AGENTS ARE AUTHORIZED TO SEIZE, BUT NOT SEARCH, ANY OTHER COMPUTERS AND ELECTRONIC STORAGE MEDIA AS DEFINED ABOVE, ANY SEARCH OF WHICH MUST BE CONDUCTED PURSUANT TO A SEPARATE SEARCH WARRANT OBTAINED FROM THE WESTERN DISTRICT OF WASHINGTON.**

**Page 6 – Attachment B**